UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHEASTERN DIVISION

SYLVIA A. WATERS,                    )
                                     )
            Plaintiff,               )
                                     )
       v.                            )        No. 2:09 CV 28 DDN
                                     )
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
            Defendant.               )

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Sylvia A. Waters for disability insurance benefits under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381, et seq.  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).  (Doc. 6.)

## I.  BACKGROUND

Plaintiff Sylvia Waters was born on February 10, 1983.  (Tr. 139.) She is 5'7" tall with a pre-pregnancy weight that has ranged from 375 pounds to 380 pounds and a pregnancy weight of close to 400 pounds. (Tr. 72.)  She is married and has two children.  (Tr. 39, 61.)  Waters was pregnant with her second child in December of 2007.  (Tr. 49.) Waters completed 12th grade and a two year study in a vocational-technical school for child development.  (Tr. 61.)  She last worked in February 2005.  (Tr. 63.)

On January 23, 2007, Waters applied for disability insurance benefits, alleging she became disabled on April 13, 2006, due to obesity, pain in both knees and ankles, back problems, asthma, carpal tunnel, acid reflux, and left wrist pain and arthritis.  (Tr. 99-101, 139.)  The claim was denied.  (Tr. 101-05.)  After a hearing, the ALJ denied benefits.  (Tr. 56-98, 47-55.)  The Appeals Council denied

plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II. ADMINISTRATIVE RECORD

On February 15, 2006 Waters sought the care of Dale Zimmerman, D.O., complaining of back pain, which had been present for two years. (Tr. 269.) Dr. Zimmerman ordered x-rays for her back pain and noted that Waters was morbidly obese. (Tr. 269-70.) Those x-rays were generally unremarkable (showing a normal lumbar spine, normal hip joint spaces bilaterally, unremarkable skeletal structures), except for a mild bilateral sacroiliitis, mild sclerosis (representing an old injury), and displacement at the sacrococcygeal junction. (Tr. 283-86.) Waters sought Dr. Zimmerman's care on numerous additional occasions throughout 2006 and 2007, for ear pain, cough, gastroesophageal reflux disease (GERD), sinusitis, bronchitis and gastroenteritis. (Tr. 251-278.)

On March 7, 2007, Waters saw Dr. Stephen Halpin, M.D., for a second opinion of Dr. Zimmerman's previous diagnosis.[1] She weighed 415 pounds. (Tr. 320.) She complained of a nonproductive cough and a grinding back pain when she stood, which had been present since her daughter's birth three years earlier. (Id.) Waters indicated the pain was worse after activities such as cleaning, bending, walking, and holding her daughter. (Id.) At that time, Dr. Halpin diagnosed Waters as possibly having fibromyalgia, but ruled out polymyalgia rheumatica. (Tr. 321.) She was prescribed a steroid medication. (Id.)

On April 10, 2007, after another examination, Dr. Halpin diagnosed Waters as having fibromyalgia, degenerative disk disease, morbid obesity, and upper respiratory tract infection. (Tr. 322-23.) He prescribed Darvocet. (Tr. 323.) He again ruled out polymyalgia rheumatica. (Tr. 322.)

On July 6, 2007, Waters saw Dr. Halpin complaining of restless leg syndrome ("RLS") for which he prescribed Requip. (Tr. 332.) She

---

[1]Waters's visits to Dr. Zimmerman and Dr. Halpin overlap one another. (Tr. 331-33, 343.)

further complained of irritable bowel syndrom, a condition diagnosed in 2001 by a gastroenterologist in Quincy, Illinois.  (Tr. 333.)

On August 15, 2007, Waters again saw Dr. Halpin who concluded she had some osteoarthritis and chronic mild pain and stiffness involving her right knee, GERD, irritable bowel syndrome, and degenerative disk disease.  (Tr. 333-34.)  Dr. Halpin noted, however, that Waters's RLS had improved and her right ear infection was resolved.  (Tr. 334.)

On August 17 and 18, 2007, Waters saw Dr. Zimmerman who examined and diagnosed her with ear pain, eustachian tube dysfunction, and morbid obesity.  (Tr.343-46.)

On March 21, 2008, Waters went to Dr. Halpin requesting that he fill out a medical source statement on her ability to do work related activities.  (Tr. 359.)  She complained of pain in her lower back from the time she wakes up until about noon and then returning around seven or eight o'clock.  (Id.)  Waters further complained of pain in her shoulders, both legs, her right knee, and her tailbone.[2]  (Id.)  Waters was pregnant at the time and was only taking Tylenol for the pain. (Id.)  Dr. Halpin opined that Waters had a normal range-of-motion in her upper extremities, but that she had limited lumbar spine flexion.  (Id.)

Dr. Halpin's medical source statement opined that Waters was limited to the following: carrying ten pounds or less; standing and/or walking less than two hours in an eight-hour workday with frequent sitting necessary; sitting less than six hours in an eight-hour work day as she must lay down every two to three hours for awhile; pushing and/or pulling because of pain in both her lower and upper extremities.  (Tr. 375-76.)  Dr. Halpin indicated that Waters could never climb, balance, kneel, or crawl, and could only crouch and/or stoop occasionally.  (Tr. 376.)  Waters has no visual or communicative limitations.  (Tr. 377.) Dr. Halpin further noted that Waters is limited by temperature extremes, humidity/wetness, hazards such as machinery or heights, and fumes, odors, chemicals or gases.  (Tr. 378.)

--------

[2]Waters's tailbone pain has been constant since a motor vehicle accident, which occurred two years before this doctor visit.  (Tr. 359.)

Following the ALJ's unfavorable decision on October 28, 2008, Waters submitted further information. On September 4, 2008, Waters gave birth to her second child. (Tr. 39.)

On October 22, 2008, Waters went to Dr. Halpin to get a Missouri Department of Social Services Medical Report including a physician's certification and disability evaluation. (Id.) Dr. Halpin noted Water's long history of chronic diffuse pain and a well-established diagnosis of fibromyalgia and degenerative osteoarthritis. (Id.) Waters was also morbidly obese, weighing 415 ponds. (Tr. 39-40.) Dr. Halpin indicated Waters had pain in the right side of her face. (Tr. 39.) She could dress herself, except that her husband had to put her shoes and socks on her feet. (Id.) Dr. Halpin further wrote that Waters has so much pain that she could not pick up her daughter; she had chronic pain; she could only walk fifty feet without stopping due to pain and dyspnea; she used scooter carts at stores; and could not lift pots of water at home in the kitchen. (Id.) Dr. Halpin's assessment of Waters was that she had fibromyalgia, osteoarthritis, degenerative disk disease, morbid obesity, and RLS. (Tr. 40.) He concluded that Waters was permanently disabled. (Id.)

On October 27, 2008, Waters went to the Samaritan Hospital emergency room complaining of an earache and face pain. (Tr. 23-26.) In that visit, Waters requested more Percocet to control her pain, indicating her doctor did not provide her enough. (Id.) The summary sheet of that visit notes that Waters had chronic right face pain and fibromyalgia, and that she was morbidly obese. (Tr. 22.)

On October 31, 2008, Waters saw Dr. Halpin who noted that Waters had been to the emergency room three times that month for right facial pain and right shoulder pain. (Tr. 41.) He also noted that Waters had not yet seen the Medicaid dentist about these problems. (Id.) After a physical exam, Dr. Halpin concluded that Waters had fibromyalgia. (Id.)

**Waters's Hearing Testimony**

On May 7, 2007, Waters testified before the ALJ. (Tr. 60-88.) At that time, Waters was six months pregnant with her second child. (Tr.

- 4 -

68.) She lived with her husband, grandmother, and four-year old daughter. (Tr. 61.) Waters last worked for about a month in February 2005 as a daycare assistant. (Tr. 63.) These employment duties included taking care of children, cooking, making beds, and watching children. (Id.) Waters left that job because she could no longer lift the children. (Tr. 63-64.) That was her second time working at daycare. (Tr. 63.) Waters first worked at the daycare after graduating from school. (Id.) She worked full-time for about four years, and left because she was pregnant with her first child. (Id.)

After giving birth to her first child in January of 2004, Waters noticed she could not lift her infant due to her back pain. (Tr. 65.) Dr. Halpin prescribed Darvocet, which she took daily, in concert with Ibuprofen and Requip from May 2007 to February 2008.[3] (Tr. 65-66, 70.) Despite the Darvocet, Waters still had quite a bit of pain. (Tr. 67.)

Waters generally woke up between 8:30 and 10:00 a.m. (Id.) She got dressed, brushed her daughter's hair, and then watched television until a little after lunchtime, when she had to lie down and rest for a couple of hours. (Id.) Waters went to bed around 10:00 p.m., but woke up four to five times a night due to the pain from her restless legs. (Tr. 67, 84.) She helped with the dishes and cooking when she was not feeling so bad. (Tr. 68.) Since the middle of 2004, she has been unable to make beds, do much laundry, clean, sweep, mop, dust or vacuum. (Tr. 83-84.)

When Waters went shopping, she normally went somewhere that offered battery operated carts. (Id.) She also had one at home. (Id.) Waters's husband put on her socks and tied her shoes because she lacked flexibility in her knees. (Tr. 68-69, 75.) She used a handicap shower, which had a stool. (Id.) Waters did not have any other difficulty taking care of her personal needs. (Id.) Guests who visited Waters could only stay for a couple of hours because she required rest. (Tr. 74.) Her hobbies included watching television and getting her daughter ready for pre-school. (Id.) Waters was limited, however, to activities she could do with her daughter while sitting down. (Id.)

---

[3]Waters was taking Requip for RLS before her pregnancy. (Tr. 70, 84.)

The heaviest thing Waters could lift was a small load of dirty laundry. (Tr. 75.) She could hold a gallon of milk in each hand, but her left wrist would give out in a short period of time.[4] (Id.) Waters could stand for about fifteen to twenty minutes at a time and occasionally used a cane. (Tr. 75-76.) She could sit for an hour before she needed to change positions. (Id.) After three hours of sitting, Waters had to lie down, usually for about an hour. (Tr. 77.)

Waters stated that pain arising from her fibromyalgia affected her neck, arms, hands, lower back, legs, and knees.[5] (Id.) She specifically described the pain as the following:

> My neck is real stiff and it's just hard to move. My shoulders feel stiff. And my arms just throb like I've used them too much. My hands [are] more or less in my fingers. They just hurt to bend or work. And my lower back is a, it's a constant pain but I have what I call back spasms and it shoots up from my lower back to my neck. Then my legs just hurt to touch. My knees bother me to bend them. And my feet just kind of ache every once in a while. They're not a constant pain.

(Tr. 78.)

Waters indicated that with her fibromyalgia she had little energy and was as tired when she got up as when she went to bed. (Id.) She had gotten daily headaches and nausea since the middle of 2007. (Tr. 78-79.) Waters felt throbbing pain in her knees and ankles. (Tr. 81-82.) Recently, she has struggled with some memory problems. (Tr. 85.) Waters had also been diagnosed with irritable bowel syndrom and had daily diarrhea. (Tr. 79-80.) Waters stated she suffered from depression, although she was not seeing a counselor or receiving any treatment. (Tr. 82-83.)

---

[4]Waters broke her left wrist in an automobile accident in January of 2001, which continued to ache and cause her sharp pain. (Tr. 80-81.) In that accident, she also cracked eight ribs, bruised her lungs, and broke a toe. (Tr. 81.)

[5]Waters first noticed these problems related to fibromyalgia in the middle of 2006. (Tr. 79.)

**Information from Lillian Hughes and Lori White**

On March 28, 2008, Lillian Hughes, Waters's grandmother, filled out a Social Security Administration questionnaire about Waters. (Tr. 192-94.) Hughes described Waters's pain as "hurt[ing] all over." (Tr. 192.) She indicated that Waters used a power chair in an attempt to help around the house but often struggled. (Id.) Hughes wrote that Waters attempted to cook from the power chair but had difficulties holding a sauce pan. (Id.)

Lori White, Waters's friend for thirteen years, also filled out an SSA questionnaire. White stated that Waters's husband had to do most of the chores around the house. She indicated that Waters's pain was apparent because she had to lie down or take medication to combat it. The only household chore she saw Waters do was cook and that was from the power chair. (Tr. 196-98.)

**Hearing Testimony of Vocational Expert John F. McGowan**

Vocational expert John F. McGowan testified before the ALJ on May 9, 2007. (Tr. 88-96.) The ALJ had the VE assume that Waters could occasionally and frequently lift ten pounds, could sit at least six hours in an eight-hour workday, stand and/or walk up to two hours in an eight-hour workday, and could not climb any ladders, ropes, and scaffolds, but could occasionally climb ramps and stairs. The ALJ also had the VE assume that Waters could not work around unprotected, dangerous heights or around unprotected, dangerous machinery, and that she needed to avoid concentrated exposure to extreme heat and exposure to noxious fumes, odors, and dust. (Tr. 92-93.)

Under the circumstances, the VE opined that Waters could not perform her past work, but that she could perform sedentary jobs such as clerical work.[6] (Tr. 93-94.) Other sedentary work included circuit board assembly, photograph mounting, and assembling glasses. (Id.)

If the ALJ had the VE assume additional restrictions such as limited bending over, an inability to pick things from the floor, and

---

[6]These jobs number about 200 in Missouri and 16,000 nationally and require a training period of two years. (Tr. 94.)

avoiding crawling or kneeling, the VE testified that those additional restrictions would not reduce the amount of sedentary jobs available. (Tr. 94-95.)  The VE indicated, however, that based on Dr. Halpin's medical source statement, discussed above, a person with those limitations would not be able to perform any sedentary work.  At the conclusion of the hearing on May 7, 2008, at the request of Waters's counsel, the ALJ gave Waters's counsel until Monday, May 12, 2008, to provide further information about Waters's fibromyalgia and irritable bowel syndrome.  (Tr. 97.)  The ALJ's unfavorable ruling was issued on October 28, 2008.

On December 22, 2008, Waters's counsel submitted the records of the Hannibal Clinic & Satellite Facilities, dated April 23 to October 31, 2008; the records of the Samaritan Hospital, dated May 1 to October 27, 2008; and an article about Cymbalta, published by Eli Lilly and Company. (Tr. 7-43.)

### III.  DECISION OF THE ALJ

The ALJ followed the five-step procedure in considering the record before him.  At Step One, the ALJ found that Waters had not engaged in substantial gainful activity since January 23, 2007.  (Tr. 49.)

At Step Two, the ALJ found Waters to have severe combinations of impairments: morbid obesity, mild osteoarthritis of the right knee, restless leg syndrome, and a history of asthma.  The ALJ stated there was no objective evidence of abnormal ankle diagnostic test results. (Tr. 50.)  The ALJ opined that there was no objective medical evidence of medically determinable fibromyalgia.[7]  He stated there was no evidence of 13 of 18 positive fibromyalgia tender points necessary for a diagnosis of that condition, citing SSR 99-2p.  Further, the ALJ indicated there was no evidence of significant fatigue, depressive symptoms, or muscle weakness or atrophy.  The ALJ stated that allegations alone will not establish disability.  Rather, there must be medical signs and laboratory findings that document medically

---

[7]The ALJ noted Waters was diagnosed with possible fibromyalgia in March and April of 2007, but was never diagnosed with that disease again.  (Tr. 50.)

determinable impairments, citing 20 CFR § 416.929(a). The ALJ stated that Waters past history of GERD did not impose significant, chronic symptoms or functional limitations with her capacity to perform basic work activities. He further found that Waters's past, controlled irritable bowel syndrom did not support a finding of symptoms or limitations preventing her from sustaining a normal work schedule. (Id.)

At Step Three, the ALJ concluded that Waters did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (Tr. 51.)

At Step Four, the ALJ determined that Waters could not perform her past work. However, the ALJ found Waters had the residual functional capacity (RFC) to perform sedentary work except for lifting or carrying more than ten pounds; standing or walking more than two hours in an eight-hour day; sitting more than six hours in an eight-hour workday; climbing ladders, ropes or scaffolds, kneeling or crawling; climbing stairs and ramps or bending more than occasionally; exposure to hazards or extreme heat; and concentrated exposure to pulmonary irritants. (Id.) In so finding, the ALJ opined that Waters's medically determinable impairments could be expected to produce symptoms, but found Waters's testimony concerning the intensity, persistence, and limiting effects of those symptoms to be not credible. (Tr. 52.) He stated that Waters's work history before her alleged disability detracted from her credibility because she has never worked more than on a sporadic basis and had never demonstrated a consistent motivation to work. (Id.)

The ALJ found Waters daily activities inconsistent with her allegations of disabling symptoms. (Id.) He indicated her subjective complaints were not supported or consistent with the clinical signs, symptoms, and findings of the objective medical evidence of record. The ALJ found the diagnostic testing showed abnormalities that could reasonably be expected to produce symptoms, but not of a disabling magnitude. (Waters's lack of strong prescription pain medication and use of over-the-counter analgesics was inconsistent with complaints of disabling pain. Although some clinical signs were consistent with

Waters's medically determinable and diagnosed sever impairments, none were of a disabling frequency, duration, and severity.  (Id.)

The ALJ found Waters could live and function independently, provide care for her daughter, perform light household chores, go grocery shopping, and drive an automobile.  He gave no credit to her need to lie down.  If that claim was true, it was reasonable to assume this would be annotated in the medical treatment records.  (Id.)  The ALJ did find that Waters's medically diagnosed morbid obesity exacerbated her other conditions and imposed significant limitations with mobility and stamina.  (Id.)

Waters had medically diagnosed mild right knee osteoarthritis. (Tr. 53.)  The ALJ saw no medical evidence of an inability to walk independently; no joint abnormality, instability or range of motion; and no muscle atrophy, weakness or inflammatory signs.  (Id.)

The ALJ opined that Dr. Halpin's medical source statement was the product of a pre-printed form questionnaire from Water's attorney, was entitled to little weight, and did not constitute substantial evidence on the record as a whole.  The reasons given were that it did not articulate an objective medical basis for the stated limitation, and that it was incompatible with the examiner's own treatment records, the conservative treatment rendered. (Tr. 53.) Further, the ALJ found that the opinion stated is not supported by he evidence as a whole and appeared to be based on the plaintiff's subjective complaints.  (Id.)

The ALJ did, however, generally accept the RFC opinion of the non-examining state agency counselor, K. Miller, which concluded that Waters was limited to essentially sedentary exertional work.  (Id.)  The ALJ concluded that Waters had a greater RFC than opined by Dr. Halpin, but more restricted than determined by the non-examining state agency counselor.  (Id.)  However, Waters did not have the RFC to perform any past relevant work.  (Tr. 54.)

At Step Five, considering Waters's age, education, work experience, and RFC, the ALJ determined that there were jobs that exist in significant numbers in the national economy that Waters could perform. (Id.)  The ALJ based this determination on the VE's testimony.  (Tr. 55.)  He concluded that Waters had the RFC to make a successful

adjustment to other work that exists in significant numbers in the national economy.[8]  (Id.)


## IV.  DECISION OF THE APPEALS COUNCIL

As stated above, following the unfavorable decision issued by the ALJ, plaintiff's counsel submitted further medical information which was considered by the Appeals Council.  The Appeals Council summarily ruled that "this information does not provide a basis for changing the Administrative Law Judge's decision." (Tr. 2.)


## V.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A),

---

[8]Based on the VE's testimony the ALJ noted there are 355,000 assembly jobs nationally.  (Tr. 55.)  The VE testified that there are 5000 such jobs in Missouri and "355[,000]" assembly jobs nationally. (Tr. 94.)

1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  Id.  Step four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work.  Id.  The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work.  Id.  If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at step five to show the claimant retains the RFC to perform other work.  Id.

In this case, the ALJ determined that Waters could not perform her past work, but that she maintained the RFC to perform other work in the national economy.  (Tr. 53-54.)

However, in this case, further medical information was submitted by plaintiff to the Appeals Council after the ALJ's decision, and the Appeals Council considered the information before the commencement of this action for judicial review.  Under those circumstances, the court must consider the new medical information and decide whether the ALJ's decision was still supported by substantial evidence.  See Flynn v. Chater, 107 F.3d 617, 621 (8th Cir. 1997); Gaddy v. Astrue, 2008 WL 4279613 at *15 (E.D.Mo. 2008)(Report and Recommendation of then Magistrate Judge Audrey G. Fleissig, adopted by District Judge Rodney W. Sippel).  This requires the court to speculate as to how the ALJ would have weighed the newly submitted information had it been available to the ALJ.  Flynn v. Astrue, 107 F.3d at 620.

Because this case must be reversed and remanded, the Commissioner shall consider on remand the additional supplemental information

provided by plaintiff to the Appeals Council, as well as any other relevant information.

## VI.  DISCUSSION

Waters argues the ALJ's decision is not supported by substantial evidence.  More specifically she alleges (1) the ALJ failed to include her fibromyalgia and osteoarthritis as part of a combination of severe impairments along with failing to comply with the Commissioner's policies in evaluating the severity of her fibromyalgia; (2) the ALJ failed to adopt the opinion of the treating physician, Dr. Halpin; (3) the ALJ failed to comply with Social Security Ruling (SSR) 02-01p by not considering the impact of Waters's obesity on her ability to work; (4) the ALJ failed to mention the VE's testimony that she is unemployable; (5) the ALJ erred as a matter of law in evaluating Waters's credibility; (6) the ALJ failed to give proper weight to the statements of Water's grandmother, Lillian Hughes, and of her life-long friend, Lori White, as required by SSR 96-7p; and (7) the ALJ has a known and proven general bias against all Social Security claimants with the same or similar characteristics as those of Waters.  (Doc. 12.)

**Fibromyalgia**

Fibromyalgia has long been recognized by the courts as an elusive diagnosis; its "cause or causes are unknown, there's no cure, and, of greatest importance to disability law, it's symptoms are entirely subjective."   Tilley v. Astrue, 580 F.3d 675, 681 (8th Cir. 2009). Symptoms of the disease include widespread pain, fatigue, disturbed sleep, and stiffness and tender spots in certain fixed locations of the body.  Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996); Stedman's Medical Dictionary, 725 (28th ed. 2006) (noting that fibromyalgia's characteristics include "chronic widespread aching and stiffness, involving particularly the neck, shoulders, back, and hips, which is aggravated by the use of the affected muscles.").[9]

_____

[9]Fibromyalgia causes long-term but variable levels of muscle and joint pain, stiffness, and fatigue.  Treatments include cold and heat
(continued...)

Courts have also recognized a diagnostic standard that requires a patient to have at least 11 of 18 tender spots to be diagnosed with fibromyalgia. <u>Sarchet</u>, 78 F.3d at 306.[10] In addition to these tender points, people with the disease experience sleep disturbances, morning stiffness, irritable bowel syndrome, chronic headaches, temporomandibular joint dysfunction, anxiety, and cognitive dysfunction. <u>See</u> SSA Memorandum, In Re Fibromyalgia, Chronic Fatigue Syndrome Objective Medical Evidence Requirements for Disability Adjudication (May 11, 1998), cited in <u>Fontenot v. Astrue</u>, 2009 WL 720890 at *5 (W.D. La. 2009); <u>Daniel v. Massanari</u>, 167 F. Supp. 2d 1090, 1091 (D. Neb. 2001).

The ALJ characterized the record as indicating that plaintiff was diagnosed with "possible" fibromyalgia in March and April 2007 medical reports. (Tr. 50.) In fact, the "possible" fibromyalgia diagnosis was made in the March report, while on April 10, 2007, Dr. Halpin's diagnosis of fibromyalgia no longer tentative but unconditional. (Tr. 321-23.)

In the post-hearing information, on October 22, 2008, when asked to fill out a Social Services Medical Report, Dr. Halpin noted Waters's long history of chronic diffuse pain and well-established diagnosis of

_____

[9](...continued)
application, massage, exercise, trigger-point injections, proper rest and diet and medications such as muscle relaxants, antidepressants, and anti-inflammatories. <u>Brosnahan v. Barnhart</u>, 336 F.3d 671, 672 n.1 (8th Cir. 2003).

[10]In 1990 the American College of Rheumatology published its Criteria for the Classification of Fibromyalgia. Generally, the ACR proposed the classification of fibromyalgia based upon widespread pain with tenderness at 11 or more of the 18 specific tender point sites. S                e                e http://www.rheumatology.org/practice/clinical/classification/fibromyalgia/1990_Criteria_for_Classification_Fibro.pdf (last viewed on June 16, 2010).

In May 2010 the ACR published its Preliminary Diagnostic Criteria for Fibromyalgia and Measurement of Symptom Severity, broadened substantially the important factors (adding cognitive problems and somatic symptoms to the tender point analysis) to consider in clinically diagnosing fibromyalgia. <u>See</u> <u>http://www.rheumatology.</u> org/practice /clinical/classification/fibromyalgia/2010_preliminary_ diagnostic_criteria.pdf (last viewed June 16, 2010).

fibromyalgia and degenerative osteoarthritis.[11]  Five days later, a
summary sheet resulting from a visit to Samaritan Hospital also noted
Waters's fibromyalgia diagnosis.  (Tr. 22-26.)  The record does not
indicate that Dr. Zimmerman or any other treating physician either
diagnosed or ruled out fibromyalgia.

The ALJ opined that there was no objective medical evidence of
medically determinable fibromyalgia.  (Tr. 50.)  He stated there was no
evidence of 13 of 18 positive tender points necessary for a diagnosis
of that condition, citing Social Security Ruling 99-2p (April 30,
1999).[12]  It should be noted that, even when the ALJ was considering
plaintiff's claim, the American College of Rheumatology required only
positive responses at only 11 of the prescribed 18 tender spots to be
diagnosed with fibromyalgia. Sarchet, 78 F.3d at 306.[13] The ALJ further
indicated there was no evidence of significant fatigue, depressive
symptoms, or muscle weakness or atrophy.  (Tr. 50.)  He stated that
allegations alone will not establish disability.  Rather, there must be
medical signs and laboratory findings that document medically
determinable impairments. (Id.)

In this regard, even by the then current standards the ALJ erred.
As stated, fibromyalgia is a disease for which there are no laboratory
tests to determine its presence or severity. Sarchet, 78 F.3d at 306.
Additionally, and "of greatest importance to disability law,
[fibromyalgia's] symptoms are entirely subjective." Tilley, 580 F.3d
at 681.  There are no confirming diagnostic tests. Brosnahan, 336 F.3d
at 672 n.1.  This Circuit has "long recognized that fibromyalgia has the
potential to be disabling." Forehand v. Barnhart, 364 F.3d 984, 987
(8th Cir. 2004).  The ALJ appears to have given no substantial

---

[11]Evidence, although not considered or presented to the ALJ can
nevertheless be considered on appeal. See Gartman v. Apfel, 220 F.3d
918, 922 (8th Cir. 2000).

[12]SSR 99-2p involves the evaluation of cases of chronic fatigue
syndrome.  While some aspects of fibromyalgia and chronic fatigue
syndrome overlap, the diseases are substantially dissimilar. See SSR
99-2p n.3.

[13]See also footnote 10.

consideration to the potentially disabling effects of fibromyalgia, improperly dismissing the disease for lack of objective evidence.

Substantial evidence on the record does not support the ALJ's opinion as it relates to fibromyalgia.

This case must be reversed and remanded for new consideration of the full record, especially the diagnoses of fibromyalgia under the May 2010 standards published by the American College of Rheumatology. <u>Cf.</u>, 20 C.F.R. § 404.1579(d)(2)(new and improved diagnostic or evaluative techniques to be used to determine that a claimant is not longer disabled).

**Waters's Credibility**

The ALJ must consider a claimant's subjective complaints. <u>Casey</u>, 503 F.3d at 695 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). In evaluating subjective complaints, the ALJ must consider the objective medical evidence, as well as the so-called <u>Polaski</u> factors. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 802 (8th Cir. 2005). These factors include: 1) the claimant's prior work history; 2) the claimant's daily activities; 3) the duration, frequency, and intensity of the claimant's pain; 4) precipitating and aggravating factors; 5) dosage, effectiveness, and side effects of medication; and 6) functional restrictions. <u>Id.</u>; <u>O'Donnell v. Barnhart</u>, 318 F.3d 811, 816 (8th Cir. 2003). While these factors must be taken into account, the ALJ does not need to recite and discuss each of the <u>Polaski</u> factors in making a credibility determination. <u>Casey</u>, 503 F.3d at 695.

The ALJ may discount subjective complaints of pain when the complaints are inconsistent with the evidence as a whole. <u>Id.</u> However, the ALJ <u>may not</u> discount a claimant's allegations of disabling pain simply because the objective medical evidence does not fully support those claims. <u>O'Donnell</u>, 318 F.3d at 816. When rejecting a claimant's complaints of pain, the ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." <u>Guilliams</u>, 393 F.3d at 802. If the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the reviewing court "will normally defer to the ALJ's credibility determination." <u>Casey</u>, 503 F.3d at 696.

Waters complained that she had pain arising from her fibromyalgia, affecting her neck, arms, hands, lower back, and knees. (Tr. 77.) She had little energy and was as tired when she woke up as when she went to bed. (Tr. 78.) Waters has headaches and nausea. (Tr. 78-79.) She started having memory problems. (Tr. 85.) Waters had been diagnosed with irritable bowel syndrom. (Tr. 79-80.) Waters stated she suffered from depression, but was not seeking treatment. (Tr. 82-83.) The ALJ found Waters's medically determinable impairments could be expected to produce the alleged symptoms, but her statement concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (Tr. 52.)

First, the ALJ discredited Waters by stating that before the alleged onset date, April 13, 2006, at age 23, Waters never worked on more than a sporadic basis and never demonstrated a consistent motivation to work. (Id.) Waters was 25 years old at the time of the hearing before the ALJ. (Tr. 60.) She testified that after graduating from vocational school, she worked full time at a daycare for approximately three to four years. (Tr. 63.)[14] She left when she became pregnant. (Id.) Waters returned to the daycare in February 2005, but testified that one month later she left because she could no longer pick up the children. (Tr. 63-64.) Under appropriate circumstances, a lack of work history may indicate a lack of motivation to work rather than a lack of ability and can effect a claimant's credibility. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). However, the circumstances of her age when allegedly disabled, her educational history, her pregnant condition, and her working approximately for four years, are not a substantial basis for finding that she was not motivated to work. The ALJ did not indicate how, given the undisputed circumstances, Waters had the ability and opportunity to work more than she did. Substantial evidence does not support the ALJ's discrediting Waters's testimony on this basis.

_____

[14]Waters's work history report indicates she performed lawn care from May 1997 to January 2004, worked as a waitress from May to September 1998, and worked at the daycare from February 2001 to June 2003, and again in 2005. (Tr. 163.)

Next, the ALJ discredited Waters by stating her requirement of minimal or conservative treatment was inconsistent with a disabling impairment. (Tr. 52.) He further found that Waters's lack of strong prescription medication and the use of over-the-counter analgesics was inconsistent with complaints of disabling pain. (Id.) When first diagnosed with fibromyalgia in March 2007, Dr. Halpin prescribed Waters a steroid medication. (Tr. 321.) Dr. Halpin prescribed her Darvocet, which she took daily, in concert with Ibuprofen and Requip from May 2007 to February 2008. (Tr. 65-66, 70.) The Requip was prescribed in July 2007 for her restless leg syndrome. (Tr. 332.) During her pregnancy, Waters could only take Tylenol. (Tr. 359.) Just over a month after giving birth to her child, during a visit to Samaritan Hospital emergency room, Waters requested more Percocet to control her pain. (Tr. 23-26.)

An ALJ may discredit a claimant's testimony about disabling pain when that claimant takes nothing stronger than over-the-counter medications to alleviate symptoms. <u>Goodale v. Halter</u>, 257 F.3d 771, 774 (8th Cir. 2001). Waters's use of nothing stronger than Tylenol occurred during her pregnancy. Before and after her pregnancy, Waters took prescribed medication. In fact, the prescribed medication was not enough to control the pain as indicated by her need for additional Percocet. Discrediting Waters for use of over-the-counter drugs while pregnant. Substantial evidence on the record does not support the ALJ's opinion hin this regard.

Third in discrediting Waters, the ALJ found her daily activities were inconsistent with her allegations of disabling symptoms. (Tr. 52.) At the hearing Waters testified that she gets dressed, brushes her daughter's hair, and watches television in the morning. (Tr. 67.) She cannot put on her own socks or tie her own shoes due to a lack of flexibility. (Tr. 68-69, 75.) Waters was also limited to activities that can be done with her daughter while siting down. (Tr. 74.) She helped with the dishes and cooking when she was not feeling bad. (Tr. 68.) She was not able to make beds, do much laundry, clean, sweep, mop, dust or vacuum since the middle of 2004. (Tr. 83-84.) When Waters shopped, she required a battery-operated cart. (Id.) Guests who

visited Waters stayed for only a couple of hours before she needed rest. (Tr. 74.)

The ALJ indicated Waters could live and function independently, provide care for her young child, perform light household chores, and go grocery shopping. (Tr. 52.) In the context of a fibromyalgia case, the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity. Brosnahan, 336 F.3d at 677. Waters cannot even tie her own shoes. She cannot do her own laundry or clean. Brushing her daughter's hair and watching television are not tantamount to providing necessary care for a young child. Substantial evidence here does not support the ALJ's opinion.

Upon remand, the Commissioner shall reconsider plaintiff Waters's credibility in light of the reconsideration of whether or not she suffers from fibromyalgia and the degree of severity of the impairment.

**Dr. Halpin's Opinion**

A treating physician's opinion is given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other medical evidence in a claimant's case record." Tilley, 580 F.3d at 679. An ALJ may grant less weight to a treating physician's opinion when it conflicts with other substantial medical evidence contained in the record as a whole. Porsch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000). The regulations require that the ALJ must "always give good reasons" for the weight afforded to the treating source's opinion. 20 C.F.R. § 404.1527(d)(2).

The ALJ dismissed Dr. Halpin's medical source statement discussed above, indicating it was a pre-printed form from Waters's attorney, was entitled to little weight, and did not constitute substantial evidence. (Tr. 53.) However, the ALJ adopted most of Dr. Halpin's medical source statement. (Tr. 51.) The only factor from that statement the ALJ does not adopt, was Waters's need to lay down for a while every two to three hours. (Id.)

Instead, the ALJ generally excepted the RFC assessment of the state agency counselor, K. Miller, who determined Waters was limited to sedentary exertional work. (Tr. 53.) Miller was a non-examining lay person. (Id.) "These assessments alone cannot be considered substantial evidence in the face of conflicting assessment of a treating physician." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). The ALJ indicated that Miller's assessment was supported and consistent with the objective medical evidence of record. (Tr. 53.) A consulting physician who does not examine a claimant at all does not constitute substantial evidence. Singh, 222 F.3d at 452. Dr. Halpin's opinion does not conflict with the record as a whole or any other treating physician as required by Porsch when discrediting a treating physician. Substantial evidence on the record does not support the ALJ's decision to discredit Dr. Halpin in favor of K. Miller.

On remand, the Commissioner shall investigate the basis for Dr. Halpin diagnosing Waters with fibromyalgia and shall reconsider his opinions regarding her medical and physical condition.

**Waters's Obesity**

When an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal. Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009) (noting that the court had previously affirmed an ALJ's denial of benefits because the "ALJ specifically referred to the claimant's obesity in evaluating his claim"). The ALJ discussed Water's obesity and body mass index. (Tr. 52.) He noted that Waters's medically determinable and diagnosed obesity exacerbated her other conditions and imposed significant limitations on her mobility and stamina. (Id.) The ALJ also listed morbid obesity as one of Waters's sever combinations of impairments, along with osteoarthritis of the right knee, RLS, and asthma. (Tr. 49.) Substantial evidence on the record indicates the ALJ specifically considered Waters's obesity.

However, because this case must be remanded for a new hearing and consideration, the Commission shall reconsider the effect of her obesity on her other impairments, including fibromyalgia.

**Vocational Expert's Testimony**

The Commissioner can rely on the testimony of the VE to satisfy his burden of showing the claimant can perform other work. <u>Robson v. Astrue</u>, 526 F.3d 389, 392 (8th Cir. 2008). Testimony from a VE constitutes substantial evidence "only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." <u>Cox v. Astrue</u>, 495 F.3d 614, 620 (8th Cir. 2007). The hypothetical question posed needs to include "only those impairments that the ALJ finds are substantially supported by the record as a whole." <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 889 (8th Cir. 2006).

During Waters's hearing, the ALJ had the VE assume that Waters could occasionally and frequently lift ten pounds, could sit at least six hours in an eight-hour workday, stand and/or walk up to two hours in an eight-hour workday, and could not climb any ladders, ropes, and scaffolds, but could occasionally climb ramps and stairs. The ALJ also had the VE assume that Waters could not work around unprotected, dangerous heights or around unprotected, dangerous machinery, and that she needed to avoid concentrated exposure to extreme heat and exposure to noxious fumes, odors, and dust. (Tr. 92-93.)

These assumptions directly related to the ALJ's ultimate RFC determination. (Tr. 51.) With these assumptions, the VE opined that Waters could work in sedentary jobs, which existed in both Missouri and nationally. (Tr. 93-94.) The VE testified, however, that based on Dr. Halpin's medical source statement, as discussed above, that hypothetical person would not be able to perform any sedentary work. (Tr. 95-96.)

Because the ALJ's RFC determination is not supported by substantial evidence on the record, the VE's answers to the ALJ's hypothetical questions, did not satisfy the Commissioner's burden to show Waters could perform work as required by <u>Robson</u>. On remand, new, relevant hypothetical questions should be submitted to the vocational expert.

**Testimony of Lillian Hughes and Lori White**

The ALJ must give full consideration to evidence presented relating to observations by third parties. <u>Polaski</u>, 739 F.3d at 1322. Although

specific articulation of credibility determinations is preferable, lack thereof does not require reversal when the ultimate finding is supported by substantial evidence on the record. <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000). When the same evidence supports discounting a third party's testimony, an ALJ's failure to give specific reasons for disregarding such testimony is inconsequential. <u>Id.</u>

Lillian Hughes and Lori White each completed and submitted questionnaires regarding Waters. (Tr. 191-98.) The ALJ did not specifically discuss either. (Tr. 47-55.) Both statements corroborated Waters's allegations of pain, inability to do chores, and use of a power chair. (Tr. 191-198.) The ALJ stated, however, that "there was no lay witness testimony providing significant independent evidence to support [Waters's] allegation of disability." (Tr. 53.)

In <u>Bates</u>, where the ALJ stated that he considered a third party's testimony, the court found no error even though the ALJ did not make express credibility findings. <u>Bates v. Charter</u>, 54 F.3d 529, 532-33 (8th Cir. 1995). The ALJ's mere summary statement that no lay witness provided independent evidence to support Waters's allegation of disability does not indicate whether or not he considered Hughes's and White's statements. Without even mentioning Hughes or White, it is hard, if not impossible, to tell whether the ALJ gave these third-party observations the full consideration they deserved. See <u>Polaski</u>, 739 F.3d at 1322. On remand, the ALJ shall consider these third party statements, and any other such information submitted upon rehearing.

**ALJ's General Bias**

Administrative law judges are presumed to be unbiased, although this presumption can be rebutted by showing a conflict of interest or some other specific reason for disqualification. <u>Rollins v. Massanari</u>, 261 F.3d 853, 857-58 (9th Cir. 2001); <u>Willis v. Astrue</u>, Civil No. 1:08 CV 1069, 2009 WL 3158211, at *3 (W.D. Ark. Sept. 28, 2009). Expressions of annoyance, impatience, dissatisfaction, and even anger, that are within the bounds of what imperfect men and women sometimes display, do not establish bias. <u>Rollins</u>, 261 F.3d at 858. To show bias, the claimant must demonstrate that the ALJ's behavior, in the context of the

whole case, "was so extreme as to display [a] clear inability to render fair judgment." Id.

Plaintiff here claims the ALJ has a known and proven general bias against all Social Security claimants with the similar characteristics as those of Waters. (Doc. 12 at 22.) In support of this claim, Waters apparently delivers statistics from her law firm's fifty-four previous decisions before this ALJ. (Id.) Absent are statistics from cases presented to the ALJ by claimants not represented by the law firm. (Id.)

Waters argues that statistics show that this ALJ exhibits a general bias in favor of denying claims. These statistics, standing alone, cannot support a finding of bias. See Doan v. Astrue, No. 04 CV 2039 DMS (RBB), 2010 WL 1031591, at **14-15 (S.D. Cal. Mar. 19, 2010). To prove an ALJ's general bias, a claimant should be able to show both direct and circumstantial evidence of bias. Id. at *14. There should be (1) admissions by the ALJ indicating "generalized bias or predisposition against social security claimants generally and certain groups specifically;" (2) testimony from attorneys regarding the ALJ's regular use of incorrect law; (3) statistical evidence showing the number of cases involving problematic credibility determinations; and (4) statistical evidence showing the number of times claimants received benefits after remand or on subsequent applications. Id.

In this case, Waters has not provided any evidence that this ALJ has made any derogatory statements about Social Security claimants, or that he made any statements about conserving government money. See id. (referring to ALJs' statements about "'no-goodnicks'" and a need "'to protect the public treasury'"). She does not point to any regular use of incorrect legal standards by this ALJ. Finally, she does not provide any statistics showing how many of this ALJ's cases have been remanded, or how many times claimants have subsequently received benefits. Waters has only provided statistics relating to this ALJ's disposition of the law firm's cases. This alone cannot support a finding of general bias against Social Security claimants. See id. ("Plaintiffs submit statistical evidence that [the ALJ] had a higher-than-average denial rate. However, there is nothing that links those statistics to bias.");

Johnson v. Comm'r of Soc. Sec., Civil Action No. 08-4901 WJM, 2009 WL 4666933, at *4 (D.N.J. Dec. 3, 2009) ("[A]n ALJ's impartiality should not be judged by result or reputation or by statistics of how that judge has previously ruled."); Smith, 2008 WL 4200694, at *5 ("[D]istrict courts are in no position to judge what threshold percentage of 'favorable' decisions is necessary to acquit an ALJ of suspicion of intolerable bias against Social Security claimants.").

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded.  An appropriate Judgment Order is issued herewith.

                              /S/    David D. Noce
                         **UNITED STATES MAGISTRATE JUDGE**

Signed on June 16, 2010.